NO. 09-3393

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA,
Appellee

v.

SHAMEK HYNSON,
Appellant

_____

APPEAL FROM JUDGMENT OF CONVICTION
IN CRIMINAL NO. 05-00576-02 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

_____

ZANE DAVID MEMEGER
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

MARK S. MILLER
Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8408

## TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER JURISDICTION. . . . . . . . . 1

STATEMENT OF APPELLATE JURISDICTION.. . . . . . . . . . . 2

STATEMENT OF ISSUES.. . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF RELATED CASES. . . . . . . . . . . . . . . 26

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . 27

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . 30

    I.   THE DISTRICT COURT DID NOT ERR IN DENYING THE
        MOTION TO SUPPRESS THE EVIDENCE RECOVERED
        FROM THE DEFENDANT'S RESIDENCE IN NEW YORK. . . 30

    II.  THE DISTRICT COURT DID NOT ERR IN ADMITTING
        EVIDENCE OF THE DEFENDANT'S INVOLVEMENT
        IN THE STRAW PURCHASE OF FIREARMS AND THE
        DRUGS AND GUNS RECOVERED FROM HIS RESIDENCE
        IN NEW YORK. . . . . . . . . . . . . . . . . . 39

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . 58

# TABLE OF AUTHORITIES

## Cases

Cannon v. United States,
      160 Fed. Appx. 555 (8th Cir. 2005) (per curiam). . . 38

Schneckloth v. Bustamonte,
      412 U.S. 218 (1973). . . . . . . . . . . . . . . 31, 33

United States v. Butch,
      256 F.3d 171 (3d Cir. 2001). . . . . . . . . . . 39, 51

United States v. Cole,
      246 Fed. Appx. 112 (3d Cir. 2007). . . . . . . . . . 36

United States v. Cross,
      308 F.3d 308 (3d Cir. 2002). . . . . . . . . . . . . 54

United States v. Cruz,
      326 F.3d 392 (3d Cir. 2003). . . . . . . . . . . 39, 40

United States v. Gibbs,
      190 F.3d 188 (3d Cir. 1999). . . . . . . . . . . . . 46

United States v. Givan,
      320 F.3d 452 (3d Cir. 2003). . . . . . . . . . . 31, 40

United States v. Gonzalez,
      222 Fed. Appx. 238 (4th Cir. 2007). . . . . . . . . . 37

United States v. Green,
      ---, F.3d -- 2010 WL 3081444
      (3d Cir. Aug. 9, 2010). . . . . . . . . . . . . . passim

United States v. Henry,
      282 F.3d 242 (3d Cir. 2002). . . . . . . . . . . . . 56

United States v. Long,
      574 F.2d 761 (3d Cir. 1978). . . . . . . . . . . . . 40

United States v. Nappier,
     155 Fed. Appx. 859 (6th Cir. 2005). . . . . . . . . . . 37

United States v. Perez,
     280 F.3d 318 (3d Cir. 2002). . . . . . . . . . . . . . 30

United States v. Price,
     558 F.3d 270 (3d Cir. 2009). . . . . . . . . . . . . . 31

United States v. Scarfo,
     850 F.2d 1020. . . . . . . . . . . . . . . . . . . . . 55

United States v. Simmons,
     679 F.2d 1042 (3d Cir. 1982). . . . . . . . . . . . . 51

United States v. Starnes,
     583 F.3d 196 (3d Cir. 2009). . . . . . . . . . . . 39, 54

United States v. Sriyuth,
     98 F.3d 739 (3d Cir.1996). . . . . . . . . . . . . . . 55

United States v. Taylor,
     522 F.3d 731 (7th Cir. 2008). . . . . . . . . . . . . 41

United States v. Universal Rehabilitation Services, Inc.,
     205 F.3d 657 (3d Cir. 2000). . . . . . . . . . . . . . 53

United States v. Watson,
     423 U.S. 411 (1976). . . . . . . . . . . . . . . . . . 36

## Statutes and Rules

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . 48

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 1512(b)(1). . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 841(a)(1).. . . . . . . . . . . . . . . . . . . . **4**

21 U.S.C. § 846.. . . . . . . . . . . . . . . . . . . . **4**

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . **2**

Fed. R. Evid. 401.. . . . . . . . . . . . . . . . . . . **42**

Fed. R. Evid. 402.. . . . . . . . . . . . . . . . . . . **42**

Fed. R. Evid. 403.. . . . . . . . . . . . . . . . **42, 54-55**

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . **passim**

## STATEMENT OF SUBJECT MATTER JURISDICTION

Because the defendant was charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## <u>STATEMENT OF APPELLATE JURISDICTION</u>

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on August 21, 2009, this Court has jurisdiction over this matter under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.  Did the district court err in denying the motion to suppress the evidence recovered from the defendant's residence in Utica, New York?

2.  Did the district court abuse its discretion in admitting evidence of the defendant's other bad acts under Federal Rule of Evidence 404(b)?

## STATEMENT OF THE CASE

On September 29, 2005, a grand jury in the Eastern District of Pennsylvania returned an 18-count indictment charging defendant/appellant Shamek Hynson and three other individuals (Price Isaac, Steven Gonzalez, and Dwight Williams) with various drug and firearms offenses.  On February 22, 2007, a 21-count superseding indictment was returned against Hynson and the same other individuals.  On April 5, 2007, a grand jury returned a 33-count second superseding indictment against these same individuals.[1]  The final indictment charged Hynson with one count of conspiracy to possess with the intent to distribute 50 grams or more of cocaine base ("crack") and heroin, in violation of 21 U.S.C. § 846 (Count 1); one count of distribution of crack, in violation of 21 U.S.C. § 841(a)(1) (Count 3); two counts of possession of a firearm during or in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts 16 and 17); six counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(1) (Counts 20 and 28

---

[1]  The second superseding indictment added several witness tampering counts and an additional firearms count.

-4-

through 32); and one count of possession of a firearm by a
convicted felon, in violation of 18 U.S.C. § 922(g)(1)
(Count 33).  These charges arose from Hynson's participation
in a violent drug trafficking organization that was based in
Lancaster, Pennsylvania.

Prior to trial, Hynson filed a motion to suppress
evidence recovered during a search of his residence in
Utica, New York.  DDE # 99.  The district court held a
hearing on the motion on November 15, 2006.  DDE # 130.  In
a memorandum opinion issued on September 11, 2007, the
district court denied the motion.  App. 468-85.  Hynson
proceeded to trial, and on September 1, 2007, was found
guilty of the conspiracy offense, three counts of witness
tampering (Counts 28, 30, 31), the two Section 924(c)
counts, and the felon-in-possession count.  The district
court, without objection from the government, subsequently
granted a judgment of acquittal as to one of the Section
924(c) counts (Count 16) (based on the government's position
that a defendant should be convicted of only one 924(c)
charge in relation to the predicate Controlled Substances
Act violation).  DDE # 342, 343.

-5-

Prior to sentencing, Hynson filed a motion to proceed pro se at sentencing.  After a hearing on the motion, the court granted Hynson's request.  The Probation Office determined that Hynson's guideline range for the drug, witness tampering, and felon-in-possession offenses was 360 months to life imprisonment, plus the mandatory consecutive 120-month penalty for the Section 924(c) offense.[2]  On August 10, 2009, the district court sentenced Hynson to life imprisonment on the drug conspiracy count, plus a 10-year consecutive sentence on the Section 924(c) count.[3]  DDE # 354.  Hynson filed a timely appeal.

---

[2]  At the time that the PSR was revised in August 2008, the court had not yet dismissed the conviction on Count 16, so that the PSR sets forth penalties for two Section 924(c) offenses.  PSR ¶¶ 131, 132.

[3]  The sentences on the other counts were ordered to run concurrently to the sentence on the drug conspiracy count.

## STATEMENT OF FACTS

### A.   The Offense Conduct.

Appellant Shamek Hynson and his half-brother, Prince Isaac, were partners in a violent drug distribution organization that operated in and around Lancaster, Pennsylvania in 2004.  PSR ¶ 18.  Isaac and Hynson employed others to help manage, package, and sell the crack cocaine and heroin.  PSR ¶ 19.  Hynson helped supervise the operation and acted as an enforcer.  PSR ¶ 68.

The second superseding indictment charged that Isaac, Hynson, and others conspired to sell crack cocaine and heroin.  Supp. App. 1-10.  The second superseding indictment further charged that Isaac and  Hynson used straw purchasers to obtain guns, obliterated the serial numbers on some of the guns, and then used some of the straw-purchased guns to protect and promote the organization.  Supp. App. 5. The second superseding indictment specifically charged that Isaac, Hynson, and other members of the organization regularly carried and used the illegally obtained guns to "threaten or assault others" in order to collect outstanding drug debts, deter and eliminate competition from rival drug

-7-

dealers, and retaliate for the robbery or "rip-off" of drugs and drug proceeds by gang members and rivals. Supp. App. 2 ( ¶ 3 ). Hynson, a convicted felon, was also charged with unlawful possession of the two guns that were found in his residence in Utica, New York in December 2004. Supp. App. 41.

Several cooperating co-conspirators testified at trial about Hynson's involvement in the drug conspiracy. Lindsay Colon, who sold crack for the organization, testified that on approximately four occasions, she assisted Isaac in packaging crack inside her apartment, and that Hynson and his girlfriend, Shanika Wilson, were present on these occasions. Supp. App. 62. During one of these sessions, Colon cut a seven-gram piece of crack into street-level quantities. Hynson then took the packaged crack to sell in Lancaster. Supp. App. 63-72. Colon further testified that she and Shanika Wilson sold crack and heroin for Isaac and Hynson when the two men went to South Carolina. Colon testified that they sold approximately 20 grams of the crack supplied by Isaac while the men were away. Supp. App. 87. She specifically recalled dealing

-8-

with two of Hynson's established customers.  Supp. App. 88-89.  Colon further testified that Isaac, Hynson, and several other men who sold drugs for Isaac were at her apartment one day when Isaac complained that they were not taking him seriously, pointing to his own cell phone and stating that this "does ten thousand a week, and you guys can't do that?" Supp. App. 65-68.

Tracy Ramirez, who began selling drugs for Isaac in the summer of 2004, testified that Isaac told her that "no one in Lancaster was gonna be selling drugs unless they were getting their product and their guns off of him." Supp. App. 225.  Hynson was with Isaac when he made this statement.  Supp. App. 226.  James Cuffie, another seller, testified that Isaac and Hynson brought him to Lancaster, and that he split all of the money he made selling drugs in Lancaster with Isaac 60%-40%.  Supp. App. 228-29.

Shanika Wilson testified that she first met Hynson in South Carolina in May or June of 2004, and that they started a romantic relationship shortly thereafter.  App. 600.  Sometime in the summer of 2004, Wilson traveled with Hynson to Lancaster, and stayed there with him for at least

-9-

six weeks.  App. 632-38.  While in Lancaster, Wilson sold
crack and heroin for Hynson.  App. 690.  Wilson corroborated
Lindsay Colon's testimony that she and Colon sold cocaine
and heroin for Isaac and Hynson when they went to South
Carolina.  App. 692.  During this period, she sold drugs to
five or six customers who made repeated purchases.  App.
693.  Wilson gave all of the money from these sales to
Hynson.  App. 696.

    While they were in Lancaster, Hynson told Wilson
that a woman named "Porscha" owed him money for crack.  App.
640.  Hynson explained that he had given Porscha some crack
to sell and that she had not given him the money for the
crack.  App. 641.  Hynson told Wilson to beat up Porscha,
which Wilson did.  App. 641.

    The evidence at trial also established that Hynson
regularly carried guns and used them in connection with the
drug trafficking activity.  On October 18, 2004, Hynson shot
Edward Cameron, "Porscha's" boyfriend, when he refused to
pay for the crack that had been fronted to Porscha.[4]
Shanika Wilson testified that she witnessed the shooting.

---

    [4]  This conduct formed the basis of the Section 924(c)
offense charged in Count 17.

App. 653  Edward Cameron testified that Hynson was the
shooter.  Supp. App. 231-36.  Lindsay Colon testified that
as soon as Wilson arrived at Colon's apartment that night,
she told Colon that Hynson had just shot Cameron.  Supp.
App. 109.  Colon and Wilson accompanied Hynson to
Coatesville to search for the gun, which Hynson had tossed
from the car window, but were unable to locate it.  Supp.
App. 135-36.  While they were searching for the gun, Hynson
stated that "Tweet," the mother of his child, had obtained
the gun in South Carolina.  Supp. App. 135-36.  Wilson
confirmed that she helped Hynson and Colon search for the
gun but were unable to find it.  App. 669-70.  Months later,
a handgun was found in this location by a private citizen.
A ballistics examination confirmed that this was the same
gun used in the Cameron shooting.  Supp. App. 256-60.

      A records trace showed that the gun used in the
Cameron shooting was purchased by Tolanda Williams in North
Carolina on October 18, 2004, four days before the Cameron
shooting.  Williams testified that she had known Hynson
since 1999 and they had a three-year-old child. App. 496.
In April and October of 2004, at the instruction of Hynson,

-11-

she obtained a gun permit and then straw-purchased numerous guns for him in North and South Carolina.  App. 497-98, 500, 505.  Williams testified that Hynson wired her money through Western Union to make some of the firearm purchases,[5] App. 499-502, and that on other occasions, Hynson and/or Isaac were present and provided the money directly to her, and told her which guns to purchase.  App. 503, 505-16.  Hynson and Isaac were present when she bought guns for them on October 14 and 15, 2004, and left to drive north on October 18.  Hynson called at about 3 a.m. the following morning and told  her to report that the guns had been stolen because "one of them had just got tossed."  App. 522-23.  Williams filed a theft report with the police as directed.

Shanika Wilson testified that while she was still in South Carolina, she too purchased guns for Hynson with money supplied by Hynson.  Hynson told her that he drilled the serial numbers off of the guns and sold them on the street in New York.  App. 605-16.  Wilson went to New York with Hynson on two occasions when he sold guns that she had straw-purchased for him in South Carolina.  App. 616.  After

---

[5]   Hynson used the name Delano Delgado to wire the money.

one of these New York trips, she accompanied him back to Lancaster and assisted him in selling drugs.

On October 18, 2004, Hynson was present when co-conspirator Michael Fowler shot Tracey Ramirez over a drug debt.[6]  Shanika Wilson testified that she was present when Hynson gave Fowler a gun and told him he had to shoot Ramirez.  App. 662.  Wilson, Fowler, and Hynson drove around looking for Ramirez, and dropped Fowler off when they spotted her.  As they drove around the block, they heard gunshots, and Fowler got back in the car with the gun and said he had done it.  Supp. App. 222-23.  Ramirez also testified that Fowler shot her.

In addition to these specific instances of gun possession, Lindsay Colon testified that from July through November 2004, she saw Isaac with a gun three or four times while at her apartment or at a hotel.  Supp. App. 143. Colon also saw Hynson with a gun "more than four or five

---

[6]  This conduct formed the basis for the Section 924(c) offense charged in Count 16.  Although the jury found Hynson guilty of this offense, the government agreed that his conviction on this count should be vacated because it was predicated on the same underlying predicate offense (the drug conspiracy) as the Section 924(c) count charged in Count 17.

-13-

times" at these same locations.  Supp. App. 144.  Colon said
that Isaac and Hynson left guns at her apartment
approximately seven times, and on one occasion left a
pillowcase containing "maybe five" gun boxes.  Supp. App.
145-47.  Colon said that the pillowcase full of guns was in
her closet for two or three days, and that Hynson eventually
removed them.  Supp. App. 145-47.  Hynson told her that he
was going to scratch the numbers off of the guns using a
tool and sell the guns in New York.  Supp. App. 150-54.
Both Isaac and Hynson told Colon that Shanika Wilson and
"Tweet" in South Carolina had purchased the guns for them.
Supp. App. 155-57.

        Shanika Wilson testified that after they searched
for the gun in Coatesville that evening, Hynson left
Lancaster without telling her.  App. 671-72.  Approximately
two days later, Hynson called Wilson and told her he was in
Utica, New York. App. 673.  Hynson told Wilson to go to a
storage facility and get a bag that contained drugs and guns
and bring it to Utica.  App. 673-79.  Hynson told Wilson
that co-defendant Steven Gonzalez was going to drive her to
New York.  App. 679.  Wilson picked up the bag, which

-14-

contained bundles of heroin and two handguns and took them
to Hynson in Utica.  App. 684-86, 699-700.

Hynson was arrested in Utica on December 7, 2004,
on outstanding warrants from South Carolina.  App. 89-94.
After Hynson was arrested and it was determined that he was
living at 705 Lansing Street in Utica, U.S. Marshals went to
the residence.  Wilson, who was in the apartment when the
marshals arrived, gave them consent to search the apartment.
After the marshals discovered what appeared to be drugs, the
local authorities obtained a search warrant for the
apartment and recovered crack cocaine, heroin, two firearms,
and Western Union receipts in the name of "Donovan Delano,"
the name used by Hynson when he wired money to Wilson and
Williams for the gun purchases.  App. 144-49.[7]  A records
check confirmed that one of the guns found in the apartment
in Utica (the .40 caliber handgun) had been purchased by

---

[7]  As a result of this search, Hynson was charged by
the local authorities with drug offenses, and on August 5,
2005, pled guilty to possession of cocaine with intent to
sell.  PSR ¶¶ 103, 104.  Hynson was sentenced to 3½-7 years
in prison.  Id.  The federal authorities in New York charged
Hynson with a felon-in-possession offense.  PSR ¶ 112.  The
charge was dismissed in July 2007 because Hynson was charged
with unlawful possession of these same guns in the
indictment in this case.  Id.

Talonda Williams in Bishopville, South Carolina on
October 15, 2004.  Supp. App. 262-71.

B.  <u>The Suppression Motion</u>.

Hynson moved to suppress the evidence that was
recovered during the search of his residence in Utica, New
York, arguing that Wilson's consent was invalid because it
was not voluntary.  At the suppression hearing, Investigator
Michael Ladd of the Oneida County Sheriff's Office testified
that while working as a member of the warrants unit on
December 7, 2004, he received a communication from the
United States Marshals Service in South Carolina advising
him that Shamek Hynson, a wanted fugitive, was possibly in
the area of Lansing Street in Utica, New York, and supplied
a photograph of Hynson.  App. 90.  While conducting
surveillance in that area on December 8, 2004, Ladd observed
Hynson walking on Lansing Street.  <u>Id</u>.  After Ladd observed
Hynson enter a store, he and two of his colleagues went in
to the store and approached Hynson.  App. 91-92, 101.  The
officers identified themselves and asked Hynson for
identification.  Hynson initially told the officers that his
name was Donovan Delano.  App. 92.  Because he had received

-16-

information that Hynson was potentially armed and dangerous, Ladd pretended that he was looking for another individual, and asked Hynson to step outside of the store with the officers so they could confirm that he was not that person. App. 93.  Ladd handcuffed Hynson before they left the store, and also preformed a pat-down search of Hynson in which he recovered cash, a cell phone, and a set of keys with a tag bearing the address of 705 Lansing Street.  App. 94.  After Ladd put Hynson in his car and showed him the photograph of Hynson that had been provided by the Marshals, Hynson admitted his true identity.  App. 94.

Deputy United States Marshal Chris Amoia learned from the South Carolina authorities that Shanika Wilson had accompanied Hynson to Utica, and that Wilson also had outstanding warrants in South Carolina.  App. 112.  Marshal Amoia was told that Hynson dealt in narcotics, was known to always carry a gun, that some weapons involved in his offenses had not been recovered, and Hynson should be considered armed and dangerous.  App. 139.

Amoia and several other U.S. Marshals proceeded to 705 Lansing Street and knocked on the front door of the

-17-

first floor apartment.  A woman who initially identified herself as Tamika Brown answered the door.  App. 113-14. The officers identified themselves and told her they wanted to talk her about Hynson.  App. 125.  She agreed to let them in and talk to them.  Three or four marshals entered the house and went into the kitchen with Wilson.  App. 126. Wilson told them she lived there with another woman and Hynson but did not volunteer her true name until later in the conversation.  Because they did not have a photograph of Wilson and were not sure if she was indeed Wilson, the officers did not tell her that she was wanted by the authorities in South Carolina until she had informed them of her true identity.  After Wilson told them her true name, Amoia advised her that she was wanted by both the Defense Department and the South Carolina authorities.  App. 128. Amoia promptly advised Wilson of her Miranda rights, including the fact that she did not have to talk to them, and Wilson acknowledged that she understood her rights. App. 115, 130.  Amoia then asked Wilson whether she would consent to a search of the apartment.  App. 115.  Amoia presented her with a consent to search form and explained

-18-

the form to her.  App. 116.  The form expressly stated that
Wilson had the right to refuse consent.  Wilson acknowledged
that she understood the consent form, agreed to the search,
and signed the form.  App. 116.

While searching the bedroom that Wilson shared
with Hynson, the marshals found a large camouflage hat
containing several bags of a chunky white substance, which
they believed to be narcotics.  App. 118.  The marshals
immediately halted their search and contacted the local
authorities to obtain a search warrant for the premises.
App. 119.

Shanika Wilson also testified at the hearing.
Wilson agreed that her consent was voluntary, App. 268,
stating that the marshals who dealt with her at the
apartment "were fine, they were nice," App. 267.  Wilson
testified that no one forced, threatened, or coerced her to
consent to the search.  App. 269.  Despite repeated attempts
on cross-examination to get Wilson to change her testimony
in this regard, Wilson maintained her ground, admitting only
that she may have been a "little intimidated" by the
marshals.  App. 280.  Wilson also resisted defense counsel's

efforts to get her to testify that the marshals forced their way into her apartment.  App. 273-74.  Likewise, counsel's efforts to get Wilson to testify that the marshals threatened to get a warrant and arrest her if she did not let them into the apartment also were unsuccessful.  App. 277.  After persistent cross-examination, Wilson finally agreed that sometime after the marshals had entered the apartment, they told Wilson they would arrest her and that she did not want to be arrested.  App. 278.  She then clarified on redirect examination that although the marshals told her at some point that she could be arrested, it was "not a serious threat" and was not "nasty" in nature.  App. 302.

Wilson admitted that she told the marshals that the drugs in the camouflage hat belonged to her, but explained that she did so because she was afraid of Hynson and the drugs really belonged to him.  App. 281-82, 301.  She readily admitted that she had transported these drugs from Lancaster at Hynson's direction.  App. 308.

The district court concluded that Wilson had
validly consented to the search of the apartment.[8]  App.
474-75.  The court found that Wilson's consent was voluntary
and was not the product of threat, coercion, or force.  Id.
The court noted that Wilson, who was 21 years old,
"permitted the marshals to enter and they then engaged in a
professional conversation," App. 474, and that the marshals
were "polite and courteous" during this discussion, App.
471.  The court further found that the marshals questioned
Wilson in a non-hostile tone, and that "she answered them
without hesitation."  App. 475.  Noting that the situation
could be considered intimidating, the court recognized that
Wilson nonetheless chose to continue the discussion.  Id.
The court stressed that the marshals read Wilson her Miranda
rights once she admitted her true identity, and used the
standard consent form that explicitly stated that she had
the right to refuse consent.  Id.  The district court denied
the motion to suppress.

---

[8]  The government did not contend that Hynson lacked
standing to challenge the voluntariness of the consent, and
raises no such claim in this appeal.

C.   **The Rule 404(b) Motion**.

        Prior to trial, the government filed a motion to
admit certain evidence pursuant to Rule 404(b).  Pertinent
to this appeal, the government sought to introduce evidence
regarding the straw-purchase of firearms in North and South
Carolina and evidence that was obtained in the search of the
apartment in Utica.  Supp. App. 272-97.  At the hearing on
this motion, the government explained that the straw-
purchase evidence was relevant because one of the guns
straw-purchased by Williams was used in the shooting of
Edward Cameron, which was charged as an overt act in the
conspiracy and formed the basis for the Section 924(c)
offense charged in Count 17, and one of the guns recovered
from Hynson's apartment in Utica was also straw-purchased by
Williams.  This gun had been transported from Lancaster to
Utica by Wilson at Hynson's direction.  In addition, the
evidence was relevant to the allegations in the indictment
that Hynson and Isaac regularly carried guns in order to
protect and promote the drug operation, and that Hynson was
involved in a second shooting that involved an outstanding
drug debt, and was direct evidence of the felon-in-

-22-

possession charge that was based on his possession of the
guns recovered in Utica.    App. 384-90.    The government
argued that at least some of this evidence was thus
intrinsic evidence of the charged offenses, and to the
extent it was not, it was relevant and admissible under Rule
404(b).    Id.

Hynson argued that evidence regarding the straw
purchases should be excluded because it related to a
separate and uncharged conspiracy that had nothing to so
with the charged drug conspiracy.    App. 391-92.    Counsel
conceded that there was a link between the gun used in the
Cameron shooting and the straw purchase of this gun in South
Carolina, as the Section 924(c) offense charged in Count 17
was premised on this incident.    App. 395.    Counsel further
recognized that the guns found in New York formed the basis
of the felon-in-possession offense charged in Count 33, but
argued that the drugs recovered from Hynson's residence in
New York were not at all related to the drug conspiracy in
Lancaster.    App. 400.    Hynson contended that the other gun
purchases were not relevant because he intended to sell the
guns in New York and not use them in connection with the

drug conspiracy.  App. 403.  Counsel further argued that the evidence was not offered for a proper purpose but was simply "an attempt to impugn his client as an individual who has committed previous crimes and is prone to violence."  App. 402.  Finally, counsel argued that even if probative, the evidence of the gun purchases other than the one used in the Cameron shooting should be excluded under Rule 403.  App. 404-05.

The district court concluded that the evidence regarding the purchase and receipt of the guns was "direct evidence of the drug and firearms charges" and thus was intrinsic to the charged crimes and admissible on this basis.  App. 483.  The court noted that the indictment charged that Hynson used straw purchasers to acquire guns and then regularly carried them for the purpose of collecting drug debts and protecting the organization.  Id.  The court found that Hynson's possession of the firearm that was used in the Cameron shooting was direct evidence of his use of a firearm to settle a drug debt.  Id.  The court further noted that the government intended to introduce evidence of Hynson's repeated possession of firearms in

-24-

connection with the drug conspiracy, so that his efforts to obtain guns was in furtherance of the conspiracy.  App. 484.

At trial, Tolanda Williams and Shanika Williams testified as described above.  In his pro se post-trial motion for a judgment of acquittal, Hynson argued that the evidence of his New York drug possession and the straw-purchase evidence was improperly admitted.  DDE # 302.  The district court found that the evidence was properly admitted because it was highly probative of and intrinsic to the charged offenses, and its probative value outweighed any prejudicial effect.  Supp. App. 485.

## STATEMENT OF RELATED CASES

Co-defendant Prince Isaac has filed an appeal which has been docketed at No. 08-4755. A briefing schedule has been issued.

Hynson has been charged in the Court of Common Pleas of Chester County, CP-15-CR-0000946-2010, with first degree murder and related charges. A trial date has not yet been set.

## SUMMARY OF ARGUMENT

1.  The district court did not err by denying the motion to suppress the evidence recovered from the defendant's residence in Utica, New York.  The record fully supports the district court's conclusion that Shanika Wilson's consent to search the apartment was voluntary. Wilson gave the officers permission to enter the apartment, and then proceeded to answer their questions in a non-confrontational setting.  After Wilson admitted her true identity, the officers accurately advised her that she was wanted in South Carolina and advised her of her Miranda rights.  The officers then asked Wilson for consent to search, using a consent to search form that expressly stated that she had the right to refuse consent.  Wilson testified that the officers were "fine" and "nice" and that she voluntarily consented to the search.  Given these circumstances, the district court rightly found that Wilson's consent was voluntary and denied the motion to suppress.

2.  The district court did not err by admitting evidence of the defendant's involvement in the straw

purchase of firearms and the guns and drugs found in his apartment in Utica.  Whether deemed to be intrinsic evidence or other bad act evidence under Rule 404(b), the evidence was properly admitted.  Some of this evidence was clearly intrinsic to the charged firearms offenses, as it directly proved that the defendant committed these crimes.  The fact that Hynson possessed drugs in New York was also direct evidence of his involvement in the drug conspiracy in Lancaster, as he brought drugs from Lancaster when he fled to New York.  If not intrinsic to the charged offenses, evidence of the straw purchases of other guns was relevant and offered for a proper, non-propensity purpose, as it showed intent, knowledge, and lack of mistake as to his gun possession and the use of guns in connection with the drug conspiracy.  Moreover, the probative value of the evidence was not outweighed by the danger of unfair prejudice.  There was little risk that the jury would be confused or misled by this evidence, or that it would lead the jury to convict Hynson on an improper basis.  Finally, even if evidence of some of the straw purchases was improperly admitted, the error was harmless, given the overwhelming evidence of

-28-

Hynson's guilt of the drug and gun offenses.  Hynson's

conviction should be affirmed.

## ARGUMENT

I.  **THE DISTRICT COURT DID NOT ERR IN DENYING THE MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE DEFENDANT'S RESIDENCE IN NEW YORK.**

### Standard of Review

"This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002).

### Discussion

Defendant/appellant Shamek Hynson contends that the district court erred by denying his motion to suppress the evidence seized from his residence in Utica, New York. Hynson contends that the search was illegal because Shanika Wilson's consent was involuntary, and that the court erred concluding that her consent was valid. This claim is meritless.

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is

-30-

conducted pursuant to consent."  Schneckloth v. Bustamonte,
412 U.S. 218, 219 (1973).  In order to determine whether
that consent was voluntary, the district court is required
to examine the totality of the circumstances.  Id. at
225-26.  "Factors to consider include: the age, education,
and intelligence of the subject; whether the subject was
advised of his or her constitutional rights; the length of
the encounter; the repetition or duration of the
questioning; and the use of physical punishment."  United
States v. Price, 558 F.3d 270, 278 (3d Cir. 2009).  In
addition, the district court may consider conditions under
which the consent to search was given, such as the officer's
conduct, the number of officers present, and the duration,
location, and time of the encounter.  Id., citing United
States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003).  The
ultimate question is whether, under all of the
circumstances, the consent was the essentially free and
unconstrained choice of its maker.  Bustamante, 412 U.S. at
227.

        In this case, the record fully supports the
district court's conclusion the Wilson's consent was

voluntary.  Marshal Amoia testified that: 1) he and two or three other marshals knocked on the door, identified themselves, told Wilson that they wanted to aks her questions about Hynson, and asked if they could come in and talk to her;  2) Wilson invited them in; 3) they accompanied Wilson to the kitchen, where Wilson sat on the counter while they asked her questions in a non-confrontational manner and she freely answered their questions; 4) once she admitted her true identity, they told her she was wanted in South Carolina and advised her of her rights, including the right not to talk to them; 5) the consent to search form was explained to Wilson, the form expressly informed her that she had the right to refuse consent, and she said she understood her rights and gave then consent to search.

Wilson's testimony was consistent with that of Amoia.  She testified that: 1) the officers asked her if they could come in and talk to her and she said yes; 2) they did not have their guns drawn and were "fine" and "nice;" and 3) her consent to search was voluntary and no one forced, threatened, or coerced her to consent to the search. Despite defense counsel's repeated attempts to get Wilson to

change this testimony, she finally agreed only that she may have been a "little intimidated" by the marshals.  App. 280. Moreover, although Wilson testified that the officers at some point told here that she was wanted in South Carolina and she could be arrested, she did not testify that the officers threatened to arrest her if she refused to give them permission to search as Hynson claims.  Rather, it was defense counsel who made this link, and when given a chance to explain, Wilson said that she did not perceive this as a threat and it was not conveyed in a "nasty" manner.

Thus, the record readily supports the district court's conclusion that Wilson's consent was voluntary under the totality of the circumstances.  Wilson was advised of her right to refuse consent and her <u>Miranda</u> rights.  While knowledge of the right to refuse consent is not a prerequisite of a voluntary search, <u>Schneckloth</u>, 412 U.S. at 218, when a person is so advised, it is certainly compelling evidence that any consent obtained thereafter is voluntary. Wilson said that the officers were "nice" and the setting was conversational and not overly intimidating.  There was no evidence that Wilson's background, education, or

-33-

intelligence affected her ability to understand the
situation or to give consent.

Without a doubt, seeking consent for a search from
a person with possession of premises is a valid and
appropriate law enforcement technique.  Here, by all
appearances the marshals acted in a professional and
commendable manner; indeed, it is difficult to imagine what
they could have done differently.

Hynson attempts to counter this persuasive record
by distorting the testimony, incorrectly claiming that
Wilson "conceded that her consent was coerced" and that she
testified that the marshals told her that they would arrest
her if she did not let them into the house and if she did
not let them search the apartment.  Br. 16.  In fact, Wilson
expressly denied that the marshals told her that they would
arrest her if she did not let them in, despite counsel's
vigorous attempt to get her to agree that this was the case,
App. 302, and expressly testified that her consent was
voluntary, App. 268.  Indeed, it was only after repeated
characterizations of the marshals' presence as intimidating
that Wilson finally agreed that it was a "little

-34-

intimidating," an observation which surely applies to any citizen's unplanned encounter with United States marshals and cannot by itself support a finding of involuntariness. App. 280.

Similarly, Hynson's claim that it was "only after these threats" that Wilson consented to the search ignores the actual testimony and instead treats counsel's leading questions as evidence. The evidence, which is entirely consistent in this regard, establishes that: 1) Wilson initially falsely identified herself as Tamika Brown; 2) once she revealed her true name, she was accurately informed that she was wanted by the authorities and she could be arrested, and was promptly given <u>Miranda</u> warnings; and 3) she was then asked for consent to search, and expressly told that she could refuse to give consent. This series of events hardly amounts to a threatening or coercive situation as Hynson claims, and instead shows that the consent was voluntary. The fact that Wilson was told that she was wanted by the South Carolina authorities and the Defense Department and was read her <u>Miranda</u> rights before she was asked for consent does not render the encounter

-35-

coercive; to the contrary, it provides her with complete information about the situation in order to allow informed consent. "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." United States v. Watson, 423 U.S. 411, 424 (1976). Thus, in Watson, the Court found that consent to search that was given while the defendant was in custody on a public street after a valid arrest and after he had been given Miranda warnings was valid and voluntary where he had been cautioned that the results of search could be used against him, there was no overt act or threat of force, and there were no indications that he was a newcomer to the law, mentally deficient, or unable in the face of an arrest to exercise free choice.  Id.

Indeed, the cases make it clear that no one factor is dispositive and courts must instead look to the totality of the circumstances.  Accordingly, the courts on numerous occasions have found that consent was voluntary where it was obtained after an arrest or Miranda warnings had been given under circumstances that were far more invasive than those present here.  See, e.g., United States v. Cole, 246 Fed.

-36-

Appx. 112, 118 (3d Cir. 2007) (not precedential) (affirming district court's finding of consent where home was stormed by a dozen police officers, the defendant was handcuffed in the presence of many officers (some armed with submachine guns), and he was never informed of his right to refuse consent; the officers did nothing intentionally to intimidate Cole or his family and granted a number of Cole's requests); <u>United States v. Gonzalez</u>, 222 Fed. Appx. 238, 245-46 (4th Cir. 2007) (although defendant was handcuffed and surrounded by police officers at the time he signed the consent to search form, consent form expressly stated that consent was voluntary, arresting officers testified that defendant was very calm and cooperative during search and did not seem concerned about officers' presence, and defendant had extensive experience with criminal justice system as result of prior arrests); <u>United States v. Nappier</u>, 155 Fed. Appx. 859, 866 (6th Cir. 2005) (consent voluntary under the totality of the circumstances although there were at least 10 officers on the scene, the presence of a canine unit, the fact that the defendant was handcuffed and in a police car and had talked to the officers for five

-37-

to ten minutes before he signed the consent form, the defendant told the officers that he did not wish to speak to them without a lawyer, and he wrote "duress" next to his signature on the consent form; the defendant was advised of his Miranda rights and was familiar with the criminal justice system); <u>Cannon v. United States</u>, 160 Fed. Appx. 555 (8th Cir. 2005) (per curiam) (finding that consent was voluntary under the totality of the circumstances even though defendant was under arrest at the time he consented to the search but had not been advised of his <u>Miranda</u> rights).

The totality of the circumstances here clearly establishes that Wilson's consent was voluntary.  The district court properly denied the motion to suppress, and its ruling should be affirmed.

## II.  THE DISTRICT COURT DID NOT ERR IN ADMITTING EVIDENCE OF THE DEFENDANT'S INVOLVEMENT IN THE STRAW PURCHASE OF FIREARMS AND THE DRUGS AND GUNS FOUND IN HIS RESIDENCE IN NEW YORK.

### Standard of Review

This Court reviews the district court's decision to admit evidence under Rule 404(b) for an abuse of discretion.  United States v. Butch, 256 F.3d 171, 175 (3d Cir. 2001).  An abuse of discretion occurs only where the district court's decision is "arbitrary, fanciful, or clearly unreasonable" - in short, where "no reasonable person would adopt the district court's view."  United States v. Starnes, 583 F.3d 196, 214 (3d Cir. 2009).  The Court exercises plenary review "of whether evidence falls within the scope of Rule 404(b)."  United States v. Green, --- F.3d ----, 2010 WL 3081444, at *4 (3d Cir. Aug. 9, 2010), citing United States v. Cruz, 326 F.3d 392, 394 (3d Cir. 2003).

### Discussion

Hynson contends that the district court erred by admitting evidence of his involvement in the straw purchase of firearms in South and North Carolina, and evidence of his

-39-

gun and drug possession in Utica, New York.  Br. 22.  This
claim is meritless.  Whether deemed to be intrinsic evidence
or evidence of other acts under Rule 404(b), the court
properly admitted this evidence.

Rule 404(b) provides that evidence of other bad
acts may not be offered to prove a criminal propensity of
the defendant, but may be admitted to prove any other
relevant issue, such as knowledge, intent, or the
relationship of the parties.  It is a "rule of inclusion
rather than exclusion."  United States v. Givan, 320 F.3d
452, 460 (3d Cir. 2003); United States v. Cruz, 326 F.3d
392, 395 (3d Cir. 2003).  Thus, other crimes evidence is
admissible under Rule 404(b) as long as "it is relevant for
any other purpose than to show the defendant's propensity to
commit the charged offense."  Givan, 320 F.3d at 460, citing
United States v. Long, 574 F.2d 761, 764 (3d Cir. 1978).  As
this Court recently reaffirmed, "the purpose of Rule 404(b)
is 'simply to keep from the jury evidence that the defendant
is prone to commit crimes or is otherwise a bad person,
implying that the jury needn't worry overmuch about the
strength of the government's evidence.'"  Green, 2010 WL

-40-

3081444 at *13, quoting <u>United States v. Taylor</u>, 522 F.3d

731, 735-36 (7th Cir. 2008).[9]

While extrinsic evidence must be analyzed under

Rule 404(b), the rule does not apply to intrinsic evidence.

This Court recently analyzed the meaning of the term

"intrinsic evidence" in this context, reviewing the history

of this term and noting that it had never adopted the

"inextricably intertwined" test employed by many courts.

<u>Green</u>, 2010 WL 3081444 at *12.  The Court expressly rejected

this test, and instead reserved the "intrinsic" label for

two narrow categories of evidence:  where it "directly

proves" the charged offense; and where uncharged acts

performed contemporaneously with the charged crime

"facilitated the commission of the charged crime."  <u>Id</u>.

---

[9]    <u>Green</u> presented a lengthy discussion of the
historical underpinnings of Rule 404(b), explaining that the
common law set forth a general rule of inadmissibility of
evidence of uncharged bad acts, subject to limited
exceptions, while the Federal Rules of Evidence changed this
approach, setting forth "a general rule of admissibility,
subject to a single exception - evidence of other wrongful
acts was admissible so long as it was not introduced *solely*
to prove criminal propensity.  Thus, the proponent no longer
had to pigeonhole his evidence into one of the established
common-law exceptions, on pain of exclusion.  If he could
identify *any* non-propensity purpose for introducing the
evidence, it was admissible."  <u>Green</u>, 2010 WL 3081444 at *9
(emphasis in original).

In reaching this conclusion, the Court noted that there was "little practical difference between admitting inextricably intertwined evidence as 'background' pursuant to Rules 401 and 402, and admitting it under Rule 404(b). In both cases, the evidence must be relevant, it must pass muster under Rule 403, and it must not be introduced solely to prove the defendant's criminal propensity."  Id. at *11. The Court further noted that "the only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request."  Id. (citations omitted).

Stressing the inclusive nature of Rule 404(b), which permits the introduction of other crimes evidence if it is offered for any non-propensity purpose, the Court recognized that it was unlikely that its holding would exclude any evidence that was currently admissible as background evidence or under the inextricably intertwined test.  Id. at *13.  To the contrary, as noted, the Court expansively described the nature of the rule in permitting evidence of wrongful but probative acts.  Rather, the only

-42-

true difference is that other crimes evidence must meet the procedural requirements of Rule 404(b); that is, the proponent must provide notice of the intent to use the evidence, and the court must give a limiting instruction upon request. Id.

In this case, the district court, which did not have the benefit of this Court's recent ruling in Green, concluded that evidence regarding the straw purchases in North and South Carolina and Hynson's gun and drug possession in Utica, New York, was admissible because it was intrinsic evidence of the charged offenses. While the district court's conclusion that all of this evidence was intrinsic may not survive the more restrictive test adopted in Green, as the Green Court predicted, this distinction has no practical consequence in this case. Indeed, even assuming that some of the evidence was other bad acts evidence, it was nevertheless admissible under Rule 404(b).[10]

---

[10]    There is no contention that the procedural requirements of Rule 404(b) were not satisfied, as the government provided notice of its intent to introduce all of the evidence at issue, and the defendant does not contend that the court refused to give a requested instruction in this regard.

Hynson challenges (1) Tolanda Williams' testimony
that she straw-purchased guns for Hynson and Isaac;
(2) Shanika Wilson's testimony about the possession of drugs
and guns in New York, and the recovery of such items in
Wilson and Hynson's apartment; and (3) Wilson's testimony
about the guns that she straw-purchased.  We consider each
set of evidence in turn.

1.  First, there is no question that Tolanda
Williams' testimony that she straw-purchased guns for Hynson
and Isaac was admissible as intrinsic evidence under the
test announced in Green.  Hynson was charged with possessing
and using a gun on October 18, 2004, in connection with the
shooting of Cameron, both as an overt act in the conspiracy
and as the Section 924(c) offense charged in Count 17.  The
evidence established that Hynson tossed this gun out of a
car window and then recruited Shanika Wilson and Lindsay
Colon to help him search for the gun.  Although they were
unable to find it, a gun was later found in this location by
a passerby, and testing confirmed that this was the gun used
in the shooting.  This gun was purchased by Williams in
North Carolina earlier on the day of the shooting.  Thus,

-44-

evidence that Williams straw-purchased guns for Hynson and Isaac "directly proved" the charged offenses and "facilitated the commission of the charged crime," and was admissible on this basis.

Similarly, Williams' testimony was clearly admissible as direct proof of the Section 922(g) offense charged in Count 33. Hynson was charged with illegally possessing two guns, one of which was purchased by Williams.

Williams' testimony that she straw-purchased other guns for Hynson was also direct proof of Hynson's gun possession and use in furtherance of the drug conspiracy, as charged in the indictment. The indictment charged that Hynson and Isaac regularly possessed and used guns to promote and protect the drug organization. In addition to the Cameron shooting, Hynson was charged with (and found guilty by the jury)[11] of a gun offense in connection with the shooting of Tracey Rodriguez, and Lindsay Colon testified that she saw Hynson with guns on multiple occasions and he frequently stored guns in her house. Thus,

---

[11] The government agreed that Hynson's conviction on this count (Count 16) should be vacated only because it was premised on the same underlying predicate offense as the Section 924(c) offense charged in Count 17.

-45-

the evidence that Williams straw-purchased other guns for
Hynson was direct evidence of the charged conduct, proving
Hynson's ability to acquire weapons.

In this regard, it is appropriate to consider this
Court's decision in United States v. Gibbs, 190 F.3d 188 (3d
Cir. 1999), which approved the admission of evidence as
intrinsic (and which Green cited as an example of such a
result).  Gibbs was one of the leaders of a cocaine
distribution conspiracy.  The government introduced evidence
that, when Gibbs suspected that a person aimed to kidnap
him, he dispatched two aides to attempt to kill that person;
and that on another occasion, when Gibbs believed that an
erstwhile co-conspirator, Sydnor, shot him, he delegated two
other workers to kill Sydnor.  This Court approved the
admission of the evidence as intrinsic, not subject to Rule
404(b), because the indictment in the case alleged that
Gibbs and others used acts of violence to protect his
position as the leader of the conspiracy.  Id. at 216.
"Since the government introduced evidence of Gibbs's use of
violence to further the illegal objectives of the cocaine
conspiracy by removing threats to himself (since threats to

Gibbs meant threats to the trafficking enterprise), the
District Court did not abuse its discretion in permitting
this evidence to come in."  Id. at 218.

Likewise in this case, proof of Hynson's
acquisition of guns (despite the prohibition of such
activity by virtue of his status as a felon), directly
proved an allegation of the indictment, that Isaac and
Hynson used straw purchasers to obtain guns, obliterated the
serial numbers on some of the guns, and then used some of
the guns to protect and promote the organization.  The
indictment charged that Isaac, Hynson, and other members of
the organization regularly carried and used the illegally
obtained guns to "threaten or assault others" in order to
collect outstanding drug debts, deter and eliminate
competition from rival drug dealers, and retaliate for the
robbery or "rip-off" of drugs and drug proceeds by gang
members and rivals.  Supp. App. ___ (¶ 3).  The district
court therefore did not err in admitting the evidence.

Moreover, even if it was not direct evidence of
the charged crimes, the testimony regarding the other gun
purchases was clearly admissible under Rule 404(b).  It was

-47-

highly probative of Hynson's intent to possess and use guns
as charged, and it explained how Hynson came to possess the
guns, demonstrating that the guns did not belong to someone
else and he did not possess them by accident or mistake.

2.  The fact that Hynson possessed guns and drugs
in Utica in December 2004 was also direct proof of the
charged conduct.  The two guns formed the basis of the
Section 922(g) offense charged in Count 33.  Moreover, the
drugs were also directly related to the charged conspiracy.

The movement of the guns and drugs to Utica,
Shanika Wilson explained, occurred immediately after Hynson
shot Edward Cameron in Lancaster on October 18, 2004, over a
drug debt.  (Hynson also assisted another shooting by a co-
conspirator on the same day.)  After the Cameron shooting,
which Wilson witnessed (and after Wilson assisted in the
futile search for Hynson's discarded gun), Hynson left town
without telling her, then called her about two days later to
report that he was in Utica, New York.  Hynson told Wilson
to go to a storage facility and get a bag that contained
drugs and guns and bring it to Utica.  Wilson did as she was
told.  App. 671-79, 684-86, 699-700.  Plainly, Hynson

-48-

decided to lie low after the October 18 shootings, and leave
Lancaster along with his stash during the inevitable police
investigation.  Therefore, the guns and drugs in Utica, the
jury could conclude, were possessed as part of the drug
conspiracy charged in the indictment, and this was direct
proof of Hynson's participation in and leadership of the
conspiracy.

3.  Wilson also testified about straw-purchasing
guns for Hynson, stating that she accompanied him on one or
two trips to New York when Hynson resold guns she bought for
him.  However, the disposition of other guns Wilson bought
for Hynson was not established, while there was evidence
that Hynson was regularly armed and that he at a minimum
stored the guns in Lancaster for some period of time.  In
addition, Hynson also told Tolanda Williams that he intended
to sell the guns she purchased for him in New York, when he
in fact used at least some of these guns in connection with
the conspiracy.  Thus, Wilson's testimony about the straw
purchases showed that Hynson intended to and indeed
possessed numerous guns during the course of the drug

-49-

conspiracy, at least some of which were used in the course
of the conspiracy.

At minimum, as with Williams' testimony, all of
Wilson's testimony about guns was admissible under Rule
404(b), to show Hynson's access to guns.  It was also
admissible under that rule to establish Wilson's
credibility.  As explained at length earlier, Shanika Wilson
testified that she first met Hynson in South Carolina in May
or June of 2004, began a romantic relationship with him, and
almost immediately began to assist him in his drug
enterprise.  In part, she testified, she sold crack and
heroin for Hynson, made sales to Hynson's customers when he
went to South Carolina, and beat up a woman who Hynson said
owed him money for crack sales.

It was appropriate to introduce Wilson's further
testimony about buying guns for Hynson, not only to prove
the allegations of the indictment that the defendants
obtained guns through straw purchases and used them to
further the conspiracy, but also to establish the depth of
Wilson's loyalty to Hynson and thus the plausibility of her
overall testimony.  The testimony about her role in

-50-

purchasing guns for Hynson was highly probative of her
credibility as to her involvement in all of the conduct she
described, as it showed that Hynson trusted her and
solicited her help in various aspects of his criminal
conduct.  See, e.g., United States v. Simmons, 679 F.2d
1042, 1050 (3d Cir. 1982) (in a conspiracy case, 404(b)
evidence may be introduced "to provide necessary background
information, to show an ongoing relationship between [the
defendant and a co-conspirator], and to help the jury
understand the co-conspirator's role in the scheme.");
United States v. Butch, 256 F.3d 171, 176 (3d Cir. 2001)
(district court did not abuse its discretion in admitting
witness' testimony regarding prior thefts committed jointly
by individuals who later joined in a theft conspiracy, in
order to fully explain their relationship).  See also Green,
2010 WL 3081444 at *11 ("allowing the jury to understand the
circumstances surrounding the charged crime - completing the
story - is a proper, non-propensity purpose under Rule
404(b)."); id. at *15 (explaining that "evidence concerning
a witness's credibility is always relevant, because
credibility is always at issue, . . . especially when the

witness is testifying for the government in a criminal
trial.").

In sum, (1) Tolanda Williams' testimony that she
straw-purchased guns for Hynson and Isaac was direct
evidence of Hynson's shooting of Cameron in furtherance of
the drug conspiracy, and his illegal possession of one of
the guns in Utica; (2) Shanika Wilson's testimony about the
possession of drugs and guns in New York, and the recovery
of such items in Wilson and Hynson's apartment, directly
proved Hynson's involvement in the drug conspiracy; and
(3) Wilson's testimony about the guns that she straw-
purchased was also direct evidence of the allegations of the
indictment regarding Hynson's acquisition of guns, and was
further admissible under Rule 404(b) to explain Wilson's
relationship with the defendant and to establish her
credibility.

In response, Hynson complains that evidence of the
straw purchase of all but the two guns implicated in the
charged firearms offenses was inadmissible, but he does not
describe the full probative value of the evidence.
Moreover, Hynson ignores the case law and repeatedly refers

to Rule 404(b) as a "rule of exclusion."  Br. 18, 24.  As
Green reinforces, Rule 404(b) is a rule of inclusion, not
exclusion, and other acts evidence is admissible if offered
for any purpose other than propensity.  Here, all of the
evidence was offered for a proper purpose - as direct proof
of his involvement in the charged crimes, to show intent,
knowledge, and lack of mistake, and to explain the
relationship between the parties - and not to show Hynson's
propensity to commit the charged crimes.

Hynson also asserts that the prejudicial impact of
the evidence substantially outweighed its probative value.
However, the district court found otherwise, and "[i]f
judicial self-restraint is ever desirable, it is when a
[Federal] Rule 403 analysis of a trial court is reviewed by
an appellate tribunal."  United States v. Universal
Rehabilitation Services, Inc., 205 F.3d 657, 665 (3d Cir.
2000) (en banc).  The district court stated:

> Evidence of Hynson's possession of drugs and guns was
> relevant because it was directly probative of Hynson's
> participation in the drug distribution conspiracy
> alleged in this case. . . . The drug and gun evidence
> also corroborates Wilson's testimony that she
> transported such items to Hynson in Utica.  Thus, the
> gun and drug evidence was highly probative of Hynson's

participation in the conspiracy, and its probative
value outweighed any prejudicial effect.

App. 10.

Rule 403 provides that relevant "evidence may be
excluded if its probative value is substantially outweighed
by the danger of unfair prejudice." Fed. R. Evid. 403.
Evidence is unfairly prejudicial if it has an undue tendency
to suggest decision on an improper basis as opposed to
evidence that merely suggests guilt. United States v.
Cross, 308 F.3d 308, 324 n.23 (3d Cir. 2002). As this Court
recently explained, unfair prejudice "clouds impartial
scrutiny and well-reasoned evaluation of the facts" and
inhibits a neutral application of legal principles to the
facts as found. United States v. Starnes, 585 F.3d 196, 215
(3d Cir. 2009) (citation omitted).

The probative value of the evidence here was not
substantially outweighed by the danger of unfair prejudice.
As explained, proof of Hynson's acquisition of the gun used
in the Cameron shooting, of a gun found in his apartment,
and of the narcotics he moved to Utica, was direct evidence
of his crimes, and thus cannot be prejudicial. The
additional testimony by Williams and Wilson concerning their

-54-

assistance in acquiring guns was very probative, and that probative value was not conceivably overcome by any prejudicial impact.

At most, Hynson presents a tenable argument with regard to evidence that he resold some of the straw-purchased guns in New York. The government nevertheless submits that this evidence was admissible under Rule 404(b) in support of Wilson's testimony, and presented scant prejudice. A jury which has properly heard of Hynson's regular acquisition of guns through straw purchases, and use of one of the guns to shoot someone, would not substantially be prejudiced by a modicum of additional evidence regarding the resale of some of the guns.[12]

---

[12]  In <u>Green</u>, the Court allowed under Rule 404(b) evidence which was infinitely more prejudicial. In <u>Green</u>, the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute. The Court held that a district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case, because the evidence helped explain the conversations between the defendant and a cooperator, and to explain the cooperator's motives in assisting law enforcement. The Court added:  "We note that we have rejected Rule 403 challenges to the admission of evidence that was just as prejudicial as the evidence at issue here.  <u>See, e.g.</u>, <u>Scarfo</u>, 850 F.2d at 1020 (evidence of uncharged murders); <u>United States v. Sriyuth</u>, 98 F.3d 739, 748 (3d Cir.1996) (evidence of uncharged rape)."

For the same reason, even assuming that any of the
straw purchase evidence or evidence regarding the items
found in his Utica apartment was improperly admitted, the
evidence was surely harmless.  An error is harmless where
the government establishes beyond a reasonable doubt that
the error complained of did not contribute to the verdict.
United States v. Henry, 282 F.3d 242, 251 (3d Cir. 2002).
Here, it is inconceivable that the verdict was influenced by
evidence of the other straw purchases, given the fact that
the jury would inevitably learn of Hynson's possession of
multiple guns, and participation in a shooting; no jury
would convict simply because it learned of a few more guns.

In addition, there was overwhelming evidence of
Hynson's guilt.  Numerous individuals testified about
Hynson's involvement in the drug conspiracy.  The evidence
establishing his gun possession in connection with the
Cameron shooting was beyond reproach, with no fewer than
three witnesses, including Cameron himself, testifying that
Hynson shot Cameron in connection with a drug debt.  There
was also no question that the guns found in the apartment in

---

Green, 2010 WL 3081444 at *11.

Utica belonged to Hynson, given the unassailable evidence that Williams purchased the gun for him and Wilson's testimony that she transported the two guns from Lancaster at his direction.  Accordingly, the evidence regarding the other straw purchases by Williams and Wilson did not affect the verdict in this case.

In sum, the district court did not err in admitting evidence about the straw purchases and the items recovered in the Utica apartment.  Hynson's conviction should be affirmed.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


/s Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


/s Mark S. Miller
MARK S. MILLER
Assistant United States Attorney
Pa. Bar No. 48205

United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8408

## **CERTIFICATION**

1.   The undersigned certifies that this brief contains 10,225 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2.   I hereby certify that the electronic version of this brief sent by e-mail to the Court was automatically scanned by ScanMail Real-Time Scan Monitor, version 3.82, by Trendmirco, and found to contain no known viruses.  I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

/s Mark S. Miller
MARK S. MILLER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Paul J. Hetznecker, Esq.
1420 Walnut Street, Suite 911
Philadelphia, PA  19102


/s Mark S. Miller
MARK S. MILLER
Assistant United States Attorney


DATED: September 7, 2010.